CROSBY, RESPONDENT, v. ROBBINS, EXECUTOR, ET AL.,
APPELLANTS.

(No. 4,004.)

(Submitted May 1, 1919.  Decided June 18, 1919.)

[182 Pac. 122.]

*Trusts—Stakeholder not Trustee—Appeal and Error—Implied
Findings—Laches—Equity.*

Trusts—Written Instruments—Construction—Stakeholder not Trustee.
  1.  A written agreement between stockholders to the effect that one
  of their number should hold "in trust" certain common stock for the
  purpose of distributing it among them in proportion to funds to be
  furnished by each for use by the corporation in carrying on business,
  the money to be furnished contemporaneously with the execution of
  the writing, or substantially so, and title to the stock to vest imme-
  diately upon payment of the money, *held* not to have created a volun-
  tary trust or constituted the holder a trustee.
Same—Who not Trustee.
  2.  The mere act of holding possession of the certificate representing
  the common stock referred to in paragraph 1 above did not constitute
  the holder a trustee.
Same.
  3.  If the holder of the certificate of stock mentioned above was not
  a trustee in fact, the recital in the agreement that he held the stock
  as such did not constitute him one.
Same—Trustees—What Insufficient to Constitute.
  4.  Confidence reposed by one person in another is not alone sufficient
  to create a trust.
Appeal and Error—Implied Findings—When Doctrine Applicable.
  5.  Under the doctrine of implied findings is limited to cases where,
  if no findings are made and none requested, the court will be pre-
  sumed to have found in favor of the prevailing party upon every issue
  necessary to support the judgment; if the court makes findings which
  are deficient, but the defects are not pointed out, it will be presumed
  that the court also found upon other facts in issue sufficient by supple-
  menting the facts found to sustain the judgment, but it will not be
  presumed that the court impliedly found facts inconsistent with the
  express findings.
Same—Implied Findings—When Doctrine Inapplicable.
  6.  Where the court expressly found upon every fact necessary to sup-
  port the judgment, there was no room for the application of implied
  findings.
Laches—Pleading—Issues and Proof.
  7.  Where the theory that plaintiff's case was based upon fraud was
  first disclosed by his reply so that defendant could not plead laches,
  the latter was nevertheless entitled to insist upon such defense if
  there was evidence to support it.

Same—Equity—Stale Demands—Duty of Court.
    8. It is the province of a court of equity to deny relief *sua sponte* whenever it appears that the demand is stale and that as a result of delay in prosecuting the claim there has been such change in the situation of defendant as to prejudice his rights in making defense.

*Appeal from District Court, Yellowstone County; A. C. Spencer, Judge.*

ACTION by George S. Crosby against F. L. Robbins, as executor of the last will of John D. Losekamp, deceased, and another. From a judgment for plaintiff and an order denying them a new trial, defendants appeal. Reversed and remanded.

*Messrs. Johnston & Coleman,* for Appellant Robbins, submitted a brief; *Mr. Wm. M. Johnston* argued the cause orally.

We are unable to find any case where a transaction such as the one here involved is construed as a trust. Our statute defines a trust as: "An obligation arising out of a personal confidence imposed in and voluntarily accepted by one for the benefit of another." (Sec. 5365, Rev. Codes.) It is not every case where the parties trust each other that the law recognizes as confidential. (*Taylor* v. *Kelley,* 103 Cal. 178, 37 Pac. 216, 217; *Brison* v. *Brison,* 75 Cal. 525, 7 Am. St. Rep. 189, 17 Pac. 689; *Saunderson* v. *Broadwell,* 82 Cal. 132, 23 Pac. 36; *Riddle* v. *Beattie,* 77 Iowa, 168, 41 N. W. 606.) The parties were all active business men, conducting their affairs. None depended on the other to protect his interest or estate; none was under any disability, nor did any of them have any source of information or power denied to the rest. Aside from the ordinary contractual relation, the evidence shows that there was no particular trust or confidence reposed in John D. Losekamp, the simple depositary or stakeholder of the stock. He had no control over the stock, no benefit from its use, no duties to perform, except delivery. By this deposit he obtained no control over the person or affairs of any of his associates. In our opinion, it will be found that the definitions of an escrow agreement as given by the various courts will be found to very substantially fit the facts involved

herein. (*Davis* v. *Clark,* 58 Kan. 100, 48 Pac. 563; *Cannon* v. *Handley,* 72 Cal. 133, 13 Pac. 315; *Gammon* v. *Bunnell,* 22 Utah, 421, 64 Pac. 958; *Lewis* v. *Prather,* 14 Ky. Law Rep. 749, 21 S. W. 538.) In a transaction of this kind, as is held by the cases cited above, the depositary acts not as a trustee, but as the simple agent of both of the other parties. The language of the court of appeals for the southern district of New York in the case of *Havana City Ry. Co.* v. *Ceballos,* 139 Fed. 538, 71 C. C. A. 326, is very much in point. It is our contention that the relationship between the parties was simply a contract relation existing between competent business men standing on the same footing and dealing in all matters at arm's-length. There was no trust, and therefore the presumptions of section 5381 of our Code do not apply herein. It will be noted that in all the cases where such a presumption is indulged in the relationship is a fiduciary one, such as husband and wife, brother and sister, guardian and ward, *etc.*

If the court should find that John D. Losekamp was a trustee for the benefit of his associates, we are still of the opinion that the court should indulge in no presumption in this case that the plaintiff herein sold his stock to Losekamp for an insufficient consideration and under undue influence. If there was a trust in this case, it appears that the whole duty of the trustee was to hold the stock until the beneficiaries had given their credit to the corporation, when it became his duty to transfer the stock to them. This was the whole scope of the trust. If this did constitute a trust relation at all, it constituted what is known as a simple or passive trust, as distinguished from an active trust where the trustee has active duties with reference to the trust property to perform. (*Inlow* v. *Christy,* 187 Pa. St. 186, 40 Atl. 823; *Ringrose* v. *Gleadlall,* 17 Cal. App. 664, 121 Pac. 407; Perry on Trusts, sec. 521.) Section 5381, Revised Codes, applies only to trusts contemplated by sections 5365 and 5368; that is: Where there is a fiduciary relation of trust and personal confidence between the parties that one thereby so gains the confidence of the other as to exercise a control or ascendency over him.

If counsel are correct in their assumption that the transaction between Bonnar, Losekamp and his associates constituted a trust, plaintiff and his associates were upon the delivery of the stock to Mr. Losekamp the beneficial owners thereof, and the latter was simply the holder of the legal title. On January 22, 1910, he placed the legal title for this stock in his associates. Thereupon the legal and equitable title were merged in the so-called beneficiaries. The purpose for which the trust had been created was accomplished in 1910; the dealings between Mr. Losekamp and Crosby, whereby Crosby assigned his forty-one shares of stock to Mr. Losekamp in August, 1911, were not commenced nor consummated during the existence of the trust, and therefore, the presumptions provided in section 5381 could not arise. (*Colton* v. *Stanford,* 82 Cal. 351, 16 Am. St. Rep. 137, 23 Pac. 16; *Halper* v. *Wolff,* 82 Conn. 552, 74 Atl. 890.)

Where the recital of alleged false statements or declarations of a deceased person is made by the party most directly interested, *viz.,* plaintiff Crosby, as the basis of his right to recover against the estate of the person whose statement he quotes, the testimony should be less entitled to credence than if a disinterested witness were testifying. (*Austin* v. *Wilcoxson,* 149 Cal. 24, 84 Pac. 417; *Holmes* v. *Connable,* 111 Iowa, 298, 82 N. W. 780; *Succession of Gabisso,* 122 La. 824, 48 South. 277; *Rinkel* v. *Lubke,* 246 Mo. 377, 152 S. W. 81; *In re McDonald's Estate,* 167 Iowa, 582, 149 N. W. 897; *Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, 248, Ann. Cas. 1914B, 468, 127 Pac. 458.)

In an action wherein it is sought to set aside the transactions between trustee and beneficiary, the ordinary rules of rescission apply. The question therefore arises, Did plaintiff seek to set aside the transfer within a reasonable time after the same was made and after his discovery of the facts constituting the alleged fraud? (*Hammond* v. *Hopkins,* 143 U. S. 224, 36 L. Ed. 134, 12 Sup. Ct. Rep. 418; *Kleinclaus* v. *Dutard,* 147 Cal. 245, 81 Pac. 516; 39 Cyc. 452.) Plaintiff was guilty of laches. (*Riley* v. *Blacker,* 51 Mont. 364, 152 Pac. 758; *Kavanaugh* v. *Flavin,* 35 Mont. 133, 88 Pac. 764; *Inlow* v. *Christy, supra.*) The

question of laches may be raised for the first time upon the hearing, even on the court's own motion. (*Suhr* v. *Lauterbach,* 164 Cal. 591, 130 Pac. 2; *Sullivan* v. *Portland etc. R. R. Co.,* 94 U. S. 806, 24 L. Ed. 324.)

Under circumstances such as here presented, Losekamp being dead, the burden of proving that the transactions in question were induced by fraud or undue influence, and for an inadequate consideration, was upon plaintiff. (*United States* v. *Denver & R. G. R. Co.,* 191 U. S. 84, 48 L. Ed. 106, 24 Sup. Ct. Rep. 33; *Freeman* v. *Blount,* 172 Ala. 655, 55 South. 293; *Givens* v. *Tidmore,* 8 Ala. 745; *Jolliffe* v. *Northern Pac. Ry. Co.,* 52 Wash. 433, 100 Pac. 977; *Walker* v. *Parker,* 169 N. C. 150, 85 S. E. 306.)

*Messrs. Nichols & Wilson,* for Appellant J. W. Vaughan, submitted a brief.

*Messrs. Collins, Campbell & Wood,* for Respondent, submitted a brief in reply to that of Appellant Robbins, and one in reply to that of Appellant Vaughan; *Mr. Sterling M. Wood* argued the cause orally.

The element of deposit which characterizes an escrow does not here exist so far as Losekamp is concerned, since he had the legal title to the stock, and consequently there would appear to have been no escrow, but there is good authority for the rule that a depositary under an escrow is the trustee of an express trust (10 R. C. L., "Escrow," 633; *Foulkes* v. *Sengstachen,* 83 Or. 118, 158 Pac. 952, 163 Pac. 311, 314; *Sabin* v. *Phoenix Stone Co.,* 60 Or. 378, 118 Pac. 494, 119 Pac. 724; *Moore* v. *Trott,* 156 Cal. 353, 134 Am. St. Rep. 131, 104 Pac. 578; *Seibel* v. *Higham,* 216 Mo. 121, 129 Am. St. Rep. 502, 115 S. W. 987.)   The true conclusion, however, as we view it, is that the transaction between the parties resulted in the creation of the trust which the pleadings admit existed, since all of the elements of such a trust are present. (39 Cyc. 34.)

The case falls within the provisions of sections 5380 and 5381, Revised Codes, relating to the obligations of trustees. Section

5381 is identical with section 2235, Kerr's Cyc. Codes of California, and while its language is so clear that there is no opportunity for a difference of opinion with respect to its meaning and application, nevertheless the supreme court of California has by repeated and uniform decisions interpreted and applied the provisions of the statute so that they are unquestionably applicable here. (See *Odell* v. *Moss,* 130 Cal. 352, 62 Pac. 555; *White* v. *Warren,* 120 Cal. 322, 49 Pac. 129, 52 Pac. 723.) The last case cited is decisive of the case at bar, for here, as in *White* v. *Warren,* there is no evidence on behalf of the appellants to disprove the rebuttable presumption of law that defendants' Exhibit 1 was obtained by John D. Losekamp by the exercise of undue influence. (*Golson* v. *Dunlap,* 73 Cal. 157, 14 Pac. 576; *Brison* v. *Brison,* 75 Cal. 525, 7 Am. St. Rep. 189, 17 Pac. 689.) The general rule, apart from statute, is expressed in 39 Cyc. 300. (See, also, Perry on Trusts and Trustees, 6th ed., par. 195.)

Appellant contends that the trust, if any, under which Losekamp was trustee, was a simple or passive trust, and that, therefore, the presumption of our statutes does not apply. It is sufficient answer to this claim to say that the legislature nowhere defines or recognizes a simple or passive trust, and that all trusts are, under section 5364, Revised Codes, either voluntary or involuntary trusts. Coming, as the transactions of Losekamp do, under the definition of a voluntary trust, no other inquiry can or need be made to bring his transactions within the terms of sections 5380 and 5381, and the other statutes relating to the obligations of trustees. However, it appears from the record that Losekamp had definite and active duties to perform under the trust, particularly those of preventing the stock from becoming scattered and sold until the notes of the refining company were paid.

It is contended that respondent should not be allowed to prevail in this action by reason of laches. The fallacy in the reasoning of counsel is found in their premise that the rules applicable to an action to set aside a transfer as fraudulent apply. This is not an action of that character, but an action in equity to

enforce a transfer of stock by a corporation, with an accounting. (*Fitzpatrick* v. *O'Neill,* 43 Mont. 552, Ann. Cas. 1912C, 296, 118 Pac. 273; 2 Pomeroy's Equitable Remedies, par. 864.) The case of *Barker* v. *Montana G. etc. Co.,* 35 Mont. 351, 89 Pac. 66, an action identical in form with the present one, disposes of the contention that respondent was barred by laches. But if any rule is to be applied other than the one announced in that case, it must be laid down in *Mantle* v. *Speculator Mining Co.,* 27 Mont. 473, 71 Pac. 665: "The authorities are uniform in holding that as between the trustee of an express trust and *cestui que trust,* the statute of limitations commences to run from the date of the disavowal of the trust by the trustee, and knowledge of such disavowal by the *cestui que trust.*" There has been no disavowal of this involuntary trusteeship except by the personal representative of Losekamp in his appearance in this action, and consequently, in that view of matters, the action has been timely instituted and no claim of laches can be justly made.

Under the rule of the cases cited by this court in *Brundy* v. *Canby,* 50 Mont. 454, 148 Pac. 315, the burden was upon the appellants, through their answers, to allege that extraordinary circumstances existed which required the application of the doctrine of laches, for there is nothing upon the face of the complaint in this action which will permit this or any court to draw any inference of laches therefrom. (10 R. C. L. "Equity," par. 157, pp. 407, 408.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

When the Northwestern Oil Refining Company, a Wyoming corporation, was organized, its preferred stock was sold to John D. Losekamp, Geo. S. Crosby, Chas. F. Stocker, O. C. Cato, J. W. Vaughan, A. H. Barth and A. S. Hanson. The common stock was held by a Dr. Bonnar. The funds derived from the sale of the preferred stock were exhausted in building a refinery, and the company found itself without means to operate or market its products. Negotiations were conducted with Dr. Bonnar with

the result that he transferred to Losekamp 410 shares of the common stock, to be distributed as a bonus to the parties who would furnish to the company the necessary funds, up to $20,000. Thereupon the seven holders of preferred stock entered into an agreement in writing, designated in the record "Exhibit 'A,' " as follows:

"Plaintiff's Exhibit 'A.'

"Whereas, the Northwestern Oil Refining Company, a Wyoming corporation, has constructed a refinery at Cowley, Wyoming, for the purpose of refining and **marketing** oil; and

"Whereas, said company has entered into a contract with the Montana & Wyoming Oil Company, under which it agrees to purchase and market the product of said oil company; and

"Whereas, said refining company is not in condition to do business, refine and market the oil belonging to said oil company, because of the lack of funds; and

"Whereas, the said refining company must have a considerable sum of money, not exceeding twenty thousand dollars, with which to enable it to do business and place its oil upon the market; and

"Whereas, forty-one thousand, two hundred and fifty dollars worth, par value, of the common stock of said company is held in trust by one John D. Losekamp for the purpose of furnishing said money:

"Now, therefore, we, A. H. Barth, George S. Crosby, J. W. Vaughan, C. F. Stocker, Albert S. Hanson, all of Billings, Yellowstone county, Montana, and O. C. Cato, of Miles City, Montana, associate ourselves and do hereby agree that with John D. Losekamp we will furnish the said twenty thousand dollars as *pro rata* to the number of shares of preferred stock we hold at this time, which divides this twenty thousand dollars as follows: A. H. Barth, $4,000; Geo. S. Crosby, $2,000; J. W. Vaughan, $2,000; C. F. Stocker, $2,000; Albert S. Hanson, $4,000; O. C. Cato, $2,000; John D. Losekamp, $4,000; and we hereby agree that according to and complying with said trust agreement, the said 41,250 shares of common stock becomes the property of the

lenders, and is to be divided according to the respective amounts above subscribed. If anyone fails to pay his entire amount set opposite his name and in accordance with trust agreement, for- feits his right, title and interest to any part or all of said common stock now held in trust, and such default will be supplied by the remaining members, and the stock divided accordingly.

"In witness whereof, the parties to this agreement have set their hands and seals this 15th day of December, 1909.

> "JOHN D. LOSEKAMP.
> "GEO. S. CROSBY.
> "CHAS. F. STOCKER,
> "O. C. CATO.
> "J. W. VAUGHAN,
> "A. H. BARTH.
> "ALBERT S. HANSON."

About the same time the sum of $10,000 was borrowed from a bank in Miles City and turned over to the company. On De- cember 18, 1909, the sum of $10,000 was borrowed from the Billings State Bank upon four company notes indorsed by the seven holders of preferred stock. On June 18, 1910, these notes were renewed by the same parties. The subsequent history of this loan is not complete. On June 23, 1910, two company notes were executed and delivered to the Merchants' National Bank of Billings, indorsed by the seven holders of preferred stock, and the sum of $15,000 was borrowed and turned into the treasury of the company. This loan was renewed November 1, 1910, the company's note being given, indorsed by the same persons ex- cept Hanson. It was thereafter renewed for the full amount in May and November, 1911, and renewed for $13,500 May 1, 1912, and for $6,000 November 1, 1912. Several payments were made during 1912, and finally, in February, 1913, the balance was paid in full. After November 1, 1911, the renewal notes were in- dorsed only by Losekamp, Vaughan, Cato and Barth.

The 410 shares transferred by Bonnar were represented by indorsed certificates which were canceled, and on December 29, 1909, certificate No. 36, for the same number of shares, was issued

to Losekamp.  On January 22, 1910, certificate No. 36 was canceled, and in lieu thereof certificates were issued as follows:

No. 45, for 41 shares, to Crosby.

No. 46, for 41 shares, to Stocker.

No. 47, for 41 shares, to Cato.

No. 48, for 41 shares, to Vaughan.

No. 49, for 82 shares, to Losekamp.

No. 50, for 82 shares, to Hanson.

No. 51, for 82 shares, to Barth.

These certificates, however, were never delivered.

In August, 1913, Losekamp died, and in December, 1914, this action was instituted by Crosby against the company to compel it to deliver certificate No. 45 to him.  The company disclaimed any interest, and, upon motion, Robbins, as executor of Losekamp's will, Vaughan, Cato and Barth were substituted as defendants.  Robbins, by answer, claimed the certificate as part of the assets of the Losekamp estate by virtue of an instrument in writing, designated in the record ''Exhibit 1,'' as follows:

''Defendants' Exhibit 1.

''August 26, 1911.

''In consideration of the sum of one dollar ($1.00) receipt of which is hereby acknowledged, I hereby assign to John D. Losekamp, of Billings, Montana, all my right, title and interest in forty-one shares of common stock of the Northwestern Oil Refining Company now held by him as trustee, which was to be delivered to me upon payment of certain notes of said company upon which my signature is indorsed, said John D. Losekamp agreeing to assume all liability incurred by my indorsement.

''GEORGE S. CROSBY.

''JOHN D. LOSEKAMP.

''Witness: EWING HARPER.''

By way of avoidance, plaintiff in his reply alleged: First, that at the time he executed and delivered Exhibit 1, Losekamp sustained toward him the relationship of trustee to beneficiary; and, second, that Exhibit 1 was procured by false and fraudulent rep-

resentations made by Losekamp. Defendant Vaughan, by a pleading in the nature of a complaint in intervention, claimed ownership to certificate No. 45 and to the shares represented by it, in virtue of his own right and as the successor in interest of Cato and Barth.

The trial was to the court without a jury. In his findings the judge who presided expresses grave doubt whether Losekamp was in fact trustee, but found that Exhibit "A," as construed by the parties, was a trust agreement by the terms of which Losekamp was trustee of an express trust; that the answering defendants had not produced evidence sufficient to overcome the presumption created by section 5381, Revised Codes; and that plaintiff should prevail. From the judgment entered on the findings and from an order denying their motion for a new trial, defendants Robbins and Vaughan appealed.

Counsel for respondent with commendable frankness concede that Exhibit "A" is not a trust agreement and did not operate to constitute Losekamp trustee for the signers, but they insist that "Exhibit 'A' as modified by the subsequent oral agreement of the parties, whereby Losekamp was to hold the stock until the notes were paid, created a trust," *etc.* This contention might have force but for the fact that the court found: " (4) That said Exhibit 'A' has never been altered, changed or modified by the parties thereto by any written agreement nor by any executed verbal agreement." And it could not be altered in any other manner. (Sec. 5067, Rev. Codes.)

According to the testimony, the signers of Exhibit "A" placed [1] a very liberal construction upon its terms. It binds each of the seven men to furnish for the company the amount of money set opposite his name; but apparently all the parties understood this provision to be satisfied if they borrowed the money on the notes of the company indorsed by themselves, and they bound themselves *inter sese* to become sureties, each for the amount set opposite his name. The concluding paragraph, "If anyone fails to pay his entire amount," *etc.*, was construed to mean that, if anyone failed to indorse in order to secure the

funds, his share of the Bonnar stock would become the property of the others who did carry out the agreement. Viewed in the light of this construction, the inquiry arises: Did Exhibit ''A'' create a voluntary trust and constitute Losekamp trustee for each of the seven signers?

''A voluntary trust is an obligation arising out of a personal confidence reposed in and voluntarily accepted by one for the benefit of another.'' (Sec. 5365, Rev. Codes.) If there exist proper subject matter, lawful purpose, and a beneficiary, a trust may be created by words or acts of the parties indicating an intention on the part of the trustor to create a trust, and on the part of the trustee an acceptance of the trust or an acknowledgment of its existence. (Secs. 5370, 5371, Rev. Codes.)

Exhibit ''A'' is devoid of anything to suggest an intention to create a trust. The legal title to the Bonnar stock was conveyed to Losekamp by Bonnar, and it may be assumed that a trust was created for the purpose of securing funds for the company; but that trust which is referred to in Exhibit ''A'' was extinguished as soon as the money was furnished and is not the trust relied upon in this action. There is not anything to suggest that Losekamp accepted a trust, if it was intended by the other signers to create such relationship. Losekamp died before this suit was instituted, and his intention can be gathered only from his acts with reference to this agreement; and, in so far as those acts indicate his intention, they disavow any purpose on his part to accept the responsibility of trustee. Almost immediately after the legal title to the Bonnar stock became vested in him, he caused his stock certificate to be canceled, and in lieu thereof caused a certificate to be issued to each subscriber for the number of shares to which he would be entitled if he fully discharged his obligations under the contract. Losekamp thereby put it out of his power to control the stock in any manner. He ceased to hold the legal title and became merely a stakeholder for his associates.

But it is said that this transfer was without authority and contrary to the understanding of the parties. Exhibit ''A'' clearly contemplates that the money would be furnished contemporane-

ously with its execution, or substantially so; for it further declares that the Bonnar stock "becomes" the property of the several signers, to be divided according to the extent of liability assumed by each. By any fair construction of this language the title to that stock vested immediately, or as soon as the money was furnished, and if any obligation was imposed upon Losekamp it was to divide the stock among those who became surety, according to their liabilities as defined by the agreement, and, when this was done, the trust created by Bonnar was fully discharged. The company had received the $20,000, and Losekamp could have been compelled to make the distribution which he did make. The transfer was made on January 22, 1910. It was a matter of record on the company's books; but, furthermore, plaintiff had actual knowledge of it about the time the transfer was made, and so far as this record discloses he offered no objection.

There is not any provision in the agreement which required Losekamp to hold the stock after the money was secured, and the court found that the agreement was not modified. From the language employed in Exhibit "A," it seems reasonably certain that the purpose of the parties to it was to define their rights and liabilities as among themselves and that it was not the intention to create a trust.

We have, then, only the bare fact that Losekamp retained [2] possession of the certificates representing the Bonnar stock, and this was not sufficient, under any authority, to create the relationship of trustee. We think the trial court erred in its findings and conclusions.

But counsel for respondent direct attention to two admissions which they claim are altogether inconsistent with any theory other than that of the existence of a trust:

(a) Exhibit 1 recites that Crosby's stock was held by Losekamp as trustee; but, if he was not such in fact, the recital could [3] not constitute him trustee. The term "trustee" is frequently used in a broad, popular sense to embrace almost every relationship where confidence is reposed. But personal confidence enters into practically every commercial transaction.

[4] Something more than mere confidence reposed by one person in another is necessary to create a trust, under our statute and the authorities generally. (39 Cyc. 22.) In popular parlance, every bailee, agent and assignee is a "trustee"; but it is a misuse of the term. The distinction between these offices is recognized by our Codes. Under certain circumstances, a bailee may be a trustee; but the bare fact that he is bailee does not constitute him trustee.

(b) Counsel for respondent refer to the fact that the answer of defendant Robbins contains admissions inconsistent with the position now taken by him. But in this counsel are mistaken. The answer of defendant Robbins contains this allegation: "The said Dr. Bonnar assigned certificates for said four hundred ten shares of the common stock of said company to the said John D. Losekamp as trustee, and it was then verbally agreed between the stockholders, so indorsing said paper of said company, that the said John D. Losekamp, as trustee for said stockholders, was to hold said certificate in trust until said notes so indorsed by said stockholders and all renewals thereof were paid, when the said John D. Losekamp was to assign said shares of stock to such stockholders as continued as indorsers of said company's paper, until the same was finally paid, and in such proportions as each of said stockholders would be entitled to receive." This allegation is denied in the reply, except that it is admitted that "said John D. Losekamp as trustee for said stockholders was to hold said certificates in trust." In other words, the answer alleges that by virtue *of an oral agreement* a trust was created. This is denied, and the court found that no such agreement was ever made, and based its findings solely upon Exhibit "A" as construed by the parties to it, and this finding was evidently in harmony with plaintiff's theory; but whether it was or not is immaterial, as no exceptions to the finding were taken. The appearance of that allegation in the answer of defendant Robbins was explained fully in the affidavit of his counsel in support of an application to amend and omit it, and, though the application

was denied, it is apparent that the court in making its findings disregarded the admission, if such it is.

It is argued by counsel for respondent that, if the findings made by the court do not support the decree, nevertheless under the doctrine of implied findings the decree must be affirmed. We are in doubt as to counsel's meaning. If it is the contention that findings in support of the allegations of fraud in fact will be [5] implied, the contention is unavailing. The doctrine of implied findings is not sufficiently broad to cover such contingency. By virtue of the provisions of section 6766, Revised Codes, it has been held that the doctrine of implied findings prevails in this state. (*Haggin* v. *Saile,* 23 Mont. 375, 59 Pac. 154.) But the doctrine is limited to cover these cases: (a) If no findings are made, and none requested, it will be presumed that the court found in favor of the prevailing party upon every issue necessary to support the judgment. (*Croft* v. *Bain,* 49 Mont. 484, 143 Pac. 960.)   (b) If the court makes findings which are deficient, but the defects are not pointed out, the presumption will be indulged that the court also found upon other facts in issue sufficient, by supplementing the facts found, to sustain the judgment. (*Yellowstone Nat*: *Bank* v. *Gagnon,* 25 Mont. 268, 64 Pac. 664.)   It will not be presumed that the court impliedly found facts inconsistent with the express findings. (*Beaverhead Canal Co.* v. *Dillon E. L. & P. Co.,* 34 Mont. 135, 85 Pac. 880.)

Upon the theory adopted, *viz.,* that Exhibit "A" created a [6] trust, the court expressly found every fact necessary to support the judgment, and there is no room for the application of the doctrine of implied findings.

Since the court found that Exhibit "A" was not modified by any subsequent agreement, the title to the Bonnar stock vested in the several signers as soon as the money was furnished to the company, and Exhibit 1 operated to transfer plaintiff's interest to Losekamp unless the transfer was procured by fraud in fact. That issue was not determined, but should be, as should also the question of laches.

While it is true that, as between plaintiff and the defendant corporation, no question of laches arose (*Barker* v. *Montana Gold etc. Min. Co.,* 35 Mont. 351, 89 Pac. 66), as between the individuals claiming to own the stock the defense was available.   It was not [7]   possible for defendant Robbins to plead that defense, as the complaint did not indicate that plaintiff relied upon fraud.   The theory of plaintiff's case was first disclosed by his reply, and, under this condition of the pleadings defendant Robbins was entitled to insist upon the defense of laches if there was any evidence to support the defense.   Indeed, it is the province of [8]   a court of equity to deny relief *sua sponte* whenever it appears that the demand is stale and that, as a result of the delay in prosecuting the claim, there has been such change in the situation of the defendant as to prejudice his rights in making defense.   (*American Min. Co., Ltd.,* v. *Basin & Bay State Min. Co.,* 39 Mont. 476, 24 L. R. A. (n. s.) 305, 104 Pac. 525; *Sullivan* v. *Portland etc. R. Co.,* 94 U. S. 806, 24 L. Ed. 324.)   If the issues of fraud in fact and laches be determined in favor of plaintiff, there will be an end to this controversy.   If either of those issues be determined in favor of Losekamp's estate, then the question will arise whether by valid subsequent oral agreement Losekamp contracted to divide the Crosby stock with Vaughan, Cato and Barth.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE COOPER concur.

Motion for rehearing denied September 16, 1919.